# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

White iPhone 8 Plus
Serial Number FD8VRC67JCM4

)
)
)
)
)

Case No.   '24  MJ1631

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 841, 846 | Distribution and Conspiracy To Distribute Controlled Substances |
| 21 USC Sec. 952, 960, 963 | Importation and Conspiracy to Import Controlled Substances |

The application is based on these facts:

See Attached Affidavit of DEA Special Agent Youssouf Toure, incorporated herein by reference.

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Youssouf Toure*
*Applicant's Signature*

Youssouf Toure, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date:    April 24, 2024

*Judge's signature*

City and state:   San Diego, California

Honorable Allison H. Goddard, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

      White iPhone 8 Plus

      Serial Number FD8VRC67JCM4

      (the "**Target Device**")

The **Target Device** is currently in the custody of Drug Enforcement Administration (DEA) and located at 2425 La Brucherie Road, Imperial, California.

## <u>ATTACHMENT B</u>

### ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of these cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **June 1, 2023, up to and including March 8, 2024**:

a.  tending to indicate efforts to deliver controlled substances from Mexico to the United States, or to sell or distribute controlled substances in the United States;

b.  tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, phone numbers – that may contain electronic evidence regarding efforts to deliver controlled substances from Mexico to the United States to traffic, sell or distribute controlled substances in the United States;

c.  tending to identify co-conspirators, criminal associates, or others involved in efforts to deliver controlled substance from Mexico to the United States or to traffic, sell or distribute controlled substances in the United States;

d.  tending to identify travel to or presence at locations involved in efforts to deliver controlled substance from Mexico to the United States, or to traffic, sell or distribute controlled substances in the United States;

e.  tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, and 963 (the Target Offenses).

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Special Agent Youssouf Toure, being duly sworn, hereby state as follows:

### INTRODUCTION

1.      I submit this affidavit in support of an application for a warrant to search the following electronic device:

White iPhone 8 Plus

Serial Number FD8VRC67JCM4

(the "**Target Device**"), as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841(a)(1), 846 (possession with intent to distribute controlled substances and conspiracy to distribute controlled substance), and 952, 960, and 963 (importation of and conspiracy to import controlled substances) (collectively, the "Target Offenses"), as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Leo CASTILLO Ramirez ("CASTILLO") for the distribution of fentanyl. The **Target Device** is currently in the custody of Drug Enforcement Administration (DEA) and located at 2425 La Brucherie Road, Imperial, California.

2.      The information contained in this affidavit is based upon my training, experience, investigation, review of reports, and consultation with other members of law enforcement. Because this affidavit is submitted for the limited purpose of establishing probable cause to support the requested search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation. All dates and times described are approximate.

### BACKGROUND

3.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since November 2022. Upon being hired as a DEA Special Agent, I attended a 16-week DEA academy in Quantico, Virginia where I received training in all aspects of controlled substance investigations including, but not limited to, the enforcement of drug laws, investigation of drug trafficking, drug recognition and

terminology, case management, undercover operations, interviewing techniques, the gathering of evidence, preservation of a crime scene, and the use of electronic surveillance. In connection with my official DEA duties, I investigate criminal violations of federal drug laws and related offenses, including violations of Title 21, United States Code, 801 et seq. and the federal Controlled Substance Act. I have received training, both formal and informal. I am currently assigned to the DEA Imperial County District Office. Prior to my employment with DEA, I was a Customs and Border Protection (CBP) Officer for three years at the Calexico Port of Entry, San Diego Office of Field Operations (OFO). Prior to working as a CBP Officer, I received a Bachelor's degree in Psychology from the Texas Southern University in 2018.

4.      In connection with my official DEA duties, I have conducted investigations and/or participated in investigations related to unlawful importation, possession with intent to distribute and distribution of controlled substances. Through my training, experience, and interaction with experienced agents, and other narcotic investigators, I have become familiar with the methods employed by narcotics traffickers in general and large international-based drug trafficking organizations to smuggle, safeguard and distribute narcotics, and to collect and launder narcotics-related proceeds. I have also assisted in managing various types of informants and cooperating sources to help further investigations. I am familiar with and have used many of the traditional methods of investigation, including, visual surveillance, informant and witness interviews, defendant debriefings, undercover operations, and the seizure of controlled substance evidence.

5.      Based on my experience, participation in the investigation of narcotics organizations, conversations with other agents, including those from the Federal Bureau of Investigation (FBI), Homeland Security Investigations (HSI), Bureau of Alcohol, Tobacco and Firearms (ATF), U.S. Customs and Border Protection (CBP), and other state and local law enforcement officers familiar with narcotics trafficking and money laundering matters, I understand methods used by narcotics trafficking organizations to smuggle and distribute their products and to launder the proceeds of such products. For example, I am aware that

drug traffickers frequently discuss criminal activity using cellular telephones and social-media accounts, and often use coded language to obscure these conversations. I am familiar with the typical make up and operation of gangs and drug trafficking organizations, including the distribution, storage, and transportation of the drugs, the collection of money, which represents the proceeds of drug trafficking and other criminal activity. I am also aware that DTOs smuggle narcotics into the United States from Mexico (and elsewhere) through Ports of Entry, by vehicle and by pedestrian crossings, and by other means. I also know that drug traffickers often require the use of a communication facility to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. I know that professional drug operations depend upon maintaining their extensive contacts and records of their activities. Communication facilities such as cellular telephones, tablets, other electronic devices, and computers, including social media platforms, can enable drug traffickers to maintain contact with associates, suppliers and customers.

6. Further, I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the Calexico Port of Entry and then to further distribute the narcotics within the United States, including within the Southern District of California. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States, and traffickers within the United States frequently communicate with each other regarding importation and distribution of narcotics. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the

narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States and further distribution thereof.

7.     Based on my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods utilized in narcotics trafficking operations and some of the unique trafficking patterns employed by narcotics organizations. I know that drug traffickers often require the use of a telephone facility to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. I know that professional drug operations depend upon maintaining their extensive contacts. The telephone enables drug traffickers to maintain contact with associates, suppliers and customers. I also know that drug traffickers sometimes use fraudulent information, such as fictitious names and false addresses, to subscribe to communication facilities, especially cellular phones. Through these investigations, my training and experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics. I am also familiar with the methods employed by large-scale narcotics organizations in attempts to thwart detection by law enforcement including but not limited to the use of cellular telephone technology, counter surveillance techniques, false or fictitious identities and addresses, and coded communications. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including their methods of distribution, storage, and transportation of narcotics, their methods of collecting proceeds of narcotics trafficking, and their methods of laundering money to conceal the nature of the proceeds. Based on my

training and experience, I know that drug trafficking at the retail level is largely a cash business. I know that drug traffickers often generate large amounts of unexplained wealth, and through financial transaction, attempt to conceal, disguise or legitimize unlawful proceeds, through domestic and international banks and their attendant services, and otherwise legitimate businesses which generate large quantities of currency. In addition, drug traffickers often use drug proceeds to purchase additional narcotics to perpetuate and promote the ongoing conspiracy. I know that drug traffickers often use cellphones to communicate with co-conspirators in furtherance of their money laundering activities. During the course of my employment, I have also become familiar with the ordinary meaning of controlled substance slang and jargon, and with the methods of packaging, consuming and transferring of controlled substances. I am also familiar with the manners and techniques of traffickers in methamphetamine, cocaine, heroin, marijuana, and fentanyl as practiced locally, including the importation from Mexico.

8.      Based on my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular devices (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular device. Specifically, searches of cellular devices of individuals involved in the importation of narcotics may yield evidence:

   a.      tending to indicate efforts to deliver controlled substances from Mexico to the United States, or to sell or distribute controlled substances in the United States;

   b.      tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, phone numbers – that may contain electronic evidence regarding efforts to deliver controlled substances from Mexico to the United States to traffic, sell or distribute controlled substances in the United States or to conduct money laundering activity;

c.    tending to identify co-conspirators, criminal associates, or others involved in efforts to deliver controlled substance from Mexico to the United States or to traffic, sell or distribute controlled substances in the United States;

d.    tending to identify travel to or presence at locations involved in efforts to deliver controlled substance from Mexico to the United States, or to traffic, sell or distribute controlled substances in the United States;

e.    tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

9.    On June 11, 2023, an agent acting in an undercover capacity (the UC) was contacted by a male source of supply of narcotics located in Mexico (FNU LNU, or the SOS) who offered to sell the UC 3,500 "M-30" fentanyl pills in Imperial County, California in exchange for $1,400. The SOS and the UC arranged the purchase of these pills to take place the following day, June 12, 2023.

10.   On June 12, 2023, the SOS informed the UC that an individual who would deliver the drugs was going from Mexicali, Mexico, to Calexico, California, to pick up the pills at a location within Calexico and then to deliver them to the UC. Subsequently on June 12, that individual was identified as CASTILLO through record checks on his telephone number and through law enforcement databases, and CASTILLO contacted the UC and informed the UC that he (CASTILLO) had crossed the border and would meet the UC at a parking lot on Birch Street in Calexico.

11.   At approximately 3:35 p.m. on June 12, 2023, agents observed CASTILLO enter a storage facility in Calexico and then exit the facility shortly thereafter. At approximately 3:52 p.m., CASTILLO met the UC at the above-mentioned parking lot and delivered to the UC approximately 3,500 "M-30" pills containing fentanyl. The UC provided CASTILLO with $1,400. CASTILLO was not detained or arrested at that time. Based on my training and experience, I believe CASTILLO accessed the storage facility

to pick up the drugs, which were stored there at the time, to then deliver the drugs to the UC.

12.     The pills CASTILLO delivered to the UC on June 12 were submitted to a laboratory for testing. Laboratory testing has confirmed that the pills contained fentanyl and had a total weight of approximately 341 grams.

13.     At approximately 2:55 p.m. on March 8, 2024, DEA agents were informed that CASTILLO crossed into the United States from Mexico at the Calexico West, California Port of Entry, as a pedestrian. Agents responded to the port of entry to approach and attempt to interview CASTILLO. At approximately 4:10 p.m., agents advised him of his Miranda rights, and CASTILLO waived them and agreed to speak with agents without an attorney present. In summary, CASTILLO told agents that he worked with people in Mexico to traffic drugs and claimed he was compelled by them or others to do so. CASTILLO stated he had brought drugs to a storage unit and, on two other occasions, brought or picked up drugs from the storage unit. CASTILLO denied ever being paid for his drug-trafficking work.

14.     CASTILLO had the **Target Device** on his person during his attempted crossing into the United States and detention on March 8, 2024. During his post-*Miranda* interview, he stated the device belonged to him, and he consented to a search of it. He also stated that he got a new phone, the **Target Device**, a few months prior. Accordingly, it is possible that CASTILLO used a different device during his distribution of fentanyl to the UC on June 12, 2023, but CASTILLO also stated that, as he obtained a new phone (the **Target Device**), he also transferred applications and data from his previous phone onto his new one (the **Target Device**). During the interview, agents conducted a brief, manual search of the device and discovered certain pertinent information and data. In any event, I am not relying on any information obtained from that initial, manual search in this Affidavit and request for a warrant to search it. The **Target Device** was seized by DEA agents and processed into evidence.

15.     CASTILLO was subsequently arrested for violation of 21 U.S.C. § 841(a)(1) and (b), distribution of fentanyl. He has since been charged in a criminal complaint, and a grand jury in this District has returned an indictment charging him distribution of 40 grams and more of fentanyl on or about June 12, 2023, and criminal forfeiture allegations (Case No. 24-CR-0492-AGS).

16.     As noted below, too, and aside from any opportunity to obtain an extraction from the **Target Device** pursuant to CASTILLO's consent, I am requesting a warrant to search the device because, based on my training and experience, I am aware that forensic extractions of cellular devices can produce more complete extractions and more responsive data than initial extractions based on an individual's consent do. I am also aware that data from cellular devices, including from applications such as Facebook Messenger or other third-party applications, may be transferred between devices as the user acquires a new one. Moreover, based on CASTILLO's own post-*Miranda* statements, I believe data from any prior cellphone CASTILLO may have used, including evidence of the Target Offenses, likely was transferred to and thus exists on the **Target Device**. Accordingly, I believe that evidence of the Target Offenses such as his June 12, 2023, sale of fentanyl, which may pre-date CASTILLO's acquisition of the **Target Device**, nonetheless likely exists and may be found on the **Target Device**. As a result, and based on all the facts set forth above, my training and experience, and my knowledge of the investigation, I am requesting this warrant to search the **Target Device** in accordance with the methodology set forth herein and for evidence of the Target Offenses, as set forth in Attachment B.

17.     Based on my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**. In light of the above facts and my experience and training, there is probable cause to believe that CASTILLO was using the **Target Device** to communicate with others to further the distribution and importation

of illicit narcotics into the United States and/or communicate with others regarding the movement of illicit narcotics within the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as CASTILLO, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Based on my training and experience, my knowledge of this investigation, the facts set forth above (including CASTILLO's June 12, 2023 delivery of fentanyl to an undercover agent and CASTILLO's statements that he transferred data from his prior phone to the **Target Device**), I believe that a search of the cellphone here from at least June 1, 2023, will yield additional information and evidence regarding CASTILLO's involvement in the Target Offenses and co-conspirators. Accordingly, I request permission to search the **Target Device** for data beginning on **June 1, 2023, up to and including March 8, 2024**.

## METHODOLOGY

17.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature, and types of services to which the devices are subscribed, and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive

9

equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the devices may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the devices manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

18.     Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the telephones and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

19.     Based on the foregoing, identifying, and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

20.     Law enforcement previously conducted a brief, manual review of certain information on the **Target Device** pursuant to CASTILLO's consent, as discussed above. However, as also described above, I am requesting a warrant to search the device for evidence of the Target Offenses in accordance with the methodology herein, including through a further manual search, and as set forth in Attachments A and B. This warrant is being sought now because some time was needed after CASTILLO's arrest and seizure of his cellphone to determine the time during which he is believed to use the **Target Device** and the need for a search of the device pursuant to a warrant, rather than through his consent upon arrest.

## CONCLUSION

21.     Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Device** will yield evidence of CASTILLO's violations of Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, and 963. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge, information, and belief.

*Youssouf Toure*
Youssouf Toure
Special Agent
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 24th day of April 2024.

Honorable Allison H. Goddard
United States Magistrate Judge